HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GOLDEN STATE FOODS CORP., et al.,

      Plaintiffs,

   v.

EXEL, INC.,

      Defendant.

CASE NO. C09-1009RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on motions for summary judgment from Plaintiffs Golden State Foods Corp. and Quality Custom Distribution Services (collectively "GSF") and from Defendant Exel, Inc. ("Exel").  Dkt. ## 19, 20.  No party requested oral argument, and the court finds argument unnecessary.  For the reasons stated below, the court GRANTS in part and DENIES in part both motions.

## II.  BACKGROUND

GSF and Exel entered into a series of agreements to distribute food products from a center Exel managed in Kent to Starbucks stores in western Washington and Alaska. The parties entered their first Interim Services Agreement ("ISA") in July or August 2008.  Sherman Decl. (Dkt. # 25-1), Ex. B.

The ISA reflected the uncertainty in the parties' relationship with each other and with Starbucks.  GSF and Exel are usually competitors.  Starbucks contracted with Exel

ORDER – 1

to manage the Kent distribution center in 2007.  In early 2008, Starbucks proposed to expand the center's operations, and Exel and Starbucks explored having GSF provide services, because GSF had provided similar services for other Starbucks stores.  When GSF and Exel began negotiating the terms of their relationship, they had limited data on the cost of GSF's services.  They also understood that their relationship was likely to change.  The ISA emphasized both its own interim nature and the interim nature of the parties' relationship, noting that the parties were attempting to negotiate a longer-term "operating services agreement" even before the ISA was set to take effect on August 4, 2008.  ISA ¶ 2.[1]  Indeed, the ISA was set to expire on the same day it commenced: August 4.  *Id.*  The parties did not expect to be bound by the ISA for long.

The parties never agreed on a long-term contract.  Instead, they extended the ISA three times, ultimately keeping it in effect until February 28, 2009.  Sherman Decl. (Dkt. # 25-1), Ex. C (Aug., Oct., and Dec. 2008 extensions to ISA).  With some exceptions not relevant here, the parties did not amend the terms of the ISA as they extended it.

The ISA required GSF to provide a list of services at a list of service locations (mostly Starbucks stores) at a list of per-stop prices.  ISA ¶ 4 & Exs. A-D.  The listed per-stop prices were to be GSF's compensation for providing services, with one relevant exception (the "Out-of-Scope Clause"):

> The Parties further acknowledge and agree that: (i) Product additions or any requests outside of the Scope of Services as defined on Exhibit B will be presented to Quality with sufficient data to allow a quotation and rate proposal and shall thereby require amendment to Exhibit D Pricing; and (ii) [subclause related to motor vehicle costs omitted].

ISA ¶ 4.  Exhibit D to the ISA reiterated the terms of the Out-of-Scope Clause:

> Product additions or any requests outside the Scope of Services as defined on Exhibit B . . . shall require amendment of this Exhibit D Pricing and subsequently impact and revise the Drop Cost Per Delivery and the reimbursable Startup Costs.

---

[1] The ISA contains eight unnumbered paragraphs.  The court cites those paragraphs as if they were numbered.

ORDER – 2

ISA, Ex. D.

The ISA also contained a clause prohibiting Exel from taking offsets from GSF's invoices in most circumstances ("Anti-Offset Clause"):

> Exel agrees that, unless Exel receives [GSF's] prior written consent, Exel shall not offset any claim or expense or deduct any such claim or expense from any invoiced amounts payable to [GSF].

ISA ¶ 4.

Not long after GSF began providing services under the ISA, it told Exel that its actual costs were exceeding the per-stop prices it had negotiated. GSF proposed a "true-up" process, wherein it would provide Exel documentation of its excess costs and negotiate compensation. It is undisputed that, after extensive negotiations between the parties, Exel made one true-up payment of approximately $162,000 for excessive costs GSF incurred through September 2008. GSF insists that this was but the first payment in accordance with an ongoing true-up agreement between the parties. Exel contends that it made the true-up payment voluntarily, with an eye toward preserving goodwill with GSF in anticipation of a long-term contract. It insists that it never agreed to make further true-up payments.

In May 2009, Starbucks decided that GSF would provide the services it needed without Exel. GSF and Exel began plans to transition work from Exel, including a plan to turn over the Kent warehouse operations to GSF. Exel had made many improvements to the Kent warehouse, and had prepaid rent and other expenses to its owner. There is no dispute that as of June 19, the date that Exel relinquished control of the warehouse to GSF, the value of the improvements and prepaid expenses was about $356,000. Larry Tandoi, GSF's vice president of business development, admitted as much in his deposition. He admitted that he and Exel reached an agreement on a list of warehouse assets that GSF would acquire. Gossler Decl. (Dkt. # 22), Ex. A (Tandoi Depo. at 100-01). GSF took possession of those assets. *Id.* at 106. Mr. Tandoi admitted that he had no

ORDER – 3

1   basis to contest that GSF received $356,086.31 in value when it took over the warehouse.

2   *Id.* at 115.  After GSF took over the warehouse, Exel offset the $356,000 from

3   outstanding invoices GSF had issued.  McNutt Decl. (Dkt. # 21) ¶ 11; Sherman Decl.

4   (Dkt. # 19-1), Ex. E (Jun. 23-24 internal Exel emails).

5          GSF sued for breach of contract and unjust enrichment, claiming that Exel failed

6   to make required true-up payments and that it violated the Anti-Offset Clause.  GSF

7   seeks summary judgment solely on Exel's breach of the Anti-Offset Clause.  Exel seeks

8   summary judgment against all of GSF's claims.

### III.  ANALYSIS

10         On a motion for summary judgment, the court must draw all inferences from the

11  admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred*

12  *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate

13  where there is no genuine issue of material fact and the moving party is entitled to a

14  judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party must initially show

15  the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

16  323 (1986).  The opposing party must then show a genuine issue of fact for trial.

17  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

18  opposing party must present probative evidence to support its claim or defense.  *Intel*

19  *Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The

20  court defers to neither party in resolving purely legal questions.  *See Bendixen v.*

21  *Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

22  **A.     With One Possible Exception, Exel Did Not Agree to Make True-Up**
        **Payments Other Than Its Payment of $162,000.**

24         GSF advances two theories to support its claim that it was underpaid for its

25  services: that it entered a separate agreement for true-up payments, and that the Out-of-

26  Scope Clause entitled it to additional payments.

28  ORDER – 4

The court begins by holding that to the extent the parties agreed on a true-up process, that agreement is not in the ISA.  In Washington, contract interpretation is a question of law.  *Tanner Elec. Coop. v. Puget Sound Power & Light*, 911 P.2d 1301, 1310 (Wash. 1996).  Where interpretation "depend[s] on the use of extrinsic evidence," or the extrinsic evidence admits more than one "reasonable inference," the court cannot interpret the contract as a purely legal matter.  *Id.*  These limitations, which arose from the decision in *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990), have engendered "much confusion" over a court's role in contract interpretation.  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 266 (Wash. 2005).  In *Hearst*, the Washington Supreme Court clarified that extrinsic evidence applies only "'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'"  *Id.* at 267 (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (Wash. 1999)) (emphasis in *Hearst*).  Absent extrinsic evidence pertaining to a specific term, the court must "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent."  *Id.* (directing courts to interpret "what was written" rather than "what was intended to be written").

The court finds nothing in the ISA that could be interpreted to provide true-up payments.  The contract is unambiguous regarding what GSF was to be paid:

> Pricing and payment terms for the Services shall be as set forth on Exhibit D ("Pricing"), and reimbursable startup costs set forth on Exhibit E ("Startup Costs") . . . .

ISA ¶ 4.  Exhibit D to the ISA provides for "contingent" pricing only in circumstances not relevant here.[2]  Exhibit E refers only to fixed prices.  The only clause in the ISA that even arguably addresses price flexibility is the Out-of-Scope Clause:

---

[2] Exhibit D contained a separate pricing category for "Day Activity (Pick-ups, Alaska Delivery, or Peninsula)".  It described that pricing category alone as "contingent upon revenues," and

ORDER – 5

> The Parties further acknowledge and agree that: (i) Product additions or any requests outside of the Scope of Services as defined on Exhibit B will be presented to Quality with sufficient data to allow a quotation and rate proposal and shall thereby require amendment to Exhibit D Pricing; and (ii) [subclause related to motor vehicle costs omitted].

ISA ¶ 4.  Exhibit D reiterates the agreement on out-of-scope services in a footnote. Exhibit B, in turn, enumerates three services:  a warehouse management system, an inventory and ordering system, and motor carrier transportation and freight services. GSF contends that it provided out-of-scope services, and should be compensated in accordance with the Out-of-Scope Clause.  The court will address that contention in Part III.B.  For now, it suffices to note that the Out-of-Scope Clause is unambiguously not a provision for additional payments in the event that GSF discovered that performing in-scope services was more costly than it had anticipated.  For example, if in-scope delivery services required more labor than GSF had budgeted for, the ISA made no provision for GSF to recover its excess costs.  This is evident from the unambiguous language of the Out-of-Scope Clause.  It is also evident from GSF's failure to invoke the Out-of-Scope Clause when it was seeking true-up payments.  As noted, the Out-of-Scope Clause required the parties to amend the pricing agreement reflected in Exhibit D to the ISA. There is no evidence that GSF ever proposed such an amendment, much less that Exel ever agreed to one.

The ISA also demonstrates that the parties knew how to contract for flexibility in pricing.  Both the Out-of-Scope Clause and the Alaska and Olympic Peninsula contingencies in the ISA demonstrate that the parties were able to address pricing contingencies where they wished.  This, in addition to the unambiguous language of the ISA, leads the court to conclude that the ISA contained no true-up agreement.

---

provided examples making clear that that contingency applied only to specific Alaska and Olympic Peninsula stores.  ISA, Ex. D.

ORDER – 6

Extrinsic evidence leads to no different conclusion about the meaning of the ISA. In order to rely on extrinsic evidence, GSF needs to point to some term within the ISA that extrinsic evidence would illuminate.  It has not done so.  Nonetheless, the court has considered the extrinsic evidence GSF offers, and finds that none of it supports GSF's effort to point to a true-up agreement into the ISA.[3]  There is nothing within the ISA providing for true-up payments for excessive (but in-scope) costs.

Although the ISA does not contain a true-up agreement, the parties were free to reach a separate true-up agreement.  They did so at least once, when they agreed on a $162,000 payment.  To the extent they made other agreements as to a true-up process or true-up payments, it is undisputed that they did not do so in writing.  The parties twice amended and extended the ISA after the true-up issue first arose, and they made no amendment addressing true-up payments.  No party points to any other written agreement.  The court thus considers whether there is any evidence that the parties reached an oral agreement obligating Exel to make true-up payments.

With one exception, which the court will discuss shortly, there is no evidence that the parties reached any agreement about true-up payments after Exel made its initial $162,000 payment.  The party seeking to rely on a contract bears the burden of proving that a contract was formed.  *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1165 (Wash. Ct. App. 2007).  GSF must offer some evidence that Exel agreed to make true-up payments.  GSF's evidence, consisting largely of emails between the parties regarding GSF's initial true-up request, establishes that Exel agreed to negotiate over a potential true-up payment, and made one such payment of about $162,000.  The very evidence that illustrates the parties' negotiations over a true-up payment, however, also illustrates that Exel made no promise to make such payments going forward.  After the parties negotiated, Exel made a payment of approximately $162,000.  Had the parties

---

[3] Among other things, both Mr. Tandoi and GSF representative Robert Jorge testified that they interpreted the ISA to contain a true-up agreement.  Their interpretation of the agreement is irrelevant.

ORDER – 7

been unable to negotiate a payment, Exel had no obligation to pay anything.  GSF's sole recourse would have been to walk away from the contract or negotiate a new pricing agreement.  Even as Exel agreed to the $160,000 true-up payment, it made no promises about future payment.  There is evidence that the parties again began negotiating about a future payment, but no evidence that Exel was obligated to make such a payment.

The only contrary piece of evidence in the record is from the deposition of GSF senior vice president Robert Jorge.  He contends that he had a "direct verbal conversation" with Daniel McNutt, the vice president of Exel's retail unit, in which Mr. McNutt agreed to an additional true-up payment of about $320,000.  Sherman Decl. (Dkt. # 25-1), Ex. L (Jorge Depo. at 41).  Mr. Jorge concedes that no one put this agreement in writing.  *Id.* at 42.  There is, moreover, no documentary evidence in the record to support this agreement.  Mr. McNutt denies that Exel ever agreed to a true-up payment other than the one for $162,000.  McNutt Decl. ¶¶ 6-7.  Nonetheless, the court cannot overlook evidence on summary judgment merely because no other evidence supports it.  Accordingly, GSF may proceed to trial on the narrow claim that Mr. McNutt agreed on behalf of Exel to make a specific additional true-up payment of approximately $320,000.

**B.    GSF Did Not Provide Out-of-Scope Services.**

As the court held in the previous section, the Out-of-Scope Clause did not give GSF any entitlement with respect to in-scope services that were more costly than it anticipated.  Instead, it required the parties to negotiate over amended prices in the event that Exel required GSF to perform services not listed in the ISA, and to amend the ISA pricing exhibit accordingly.

GSF's representatives admitted that GSF performed no out-of-scope services.  Mr. Tandoi admitted that Exel added no products beyond those listed in the agreement.  Gossler Decl. (Dkt. # 22), Ex. A (Tandoi Depo. at 40).  He admitted that Exel did not ask

ORDER – 8

GSF to perform services other than those listed in the ISA.  *Id.* at 41.  Later in the

deposition, defense counsel asked for clarification:

> Q:  The work itself didn't change; there was just more of it than what you
> had originally anticipated; is that fair?
>
> A.  Correct.

*Id.* at 57.

Like Mr. Tandoi, Mr. Jorge was unable to point to any out-of-scope services that

GSF performed:

> Q:  And what type of work did [GSF] end up performing that it did not
> originally agree to provide?
>
> A:  I can't answer that specifically.
>
> Q:  So you don't have a specific item you can point me to as we sit here
> today?
>
> A:  No.

Sherman Decl. (Dkt. # 25-1), Ex. L (Jorge Depo. at 41).

The court finds no evidence that GSF performed out-of-scope services, much less

evidence that would undermine Mr. Jorge's and Mr. Tandoi's admissions.[4]  The court has

already observed, moreover, that the parties never attempted to amend the ISA to reflect

new pricing for out-of-scope services, as the Out-of-Scope Clause requires.  The court

thus rules that GSF has no basis to invoke the Out-of-Scope Clause.

---

[4] Mr. Tandoi testified that Chris Blickhan from Exel admitted in an email that GSF had
performed out-of-scope services.  Sherman Decl. (Dkt. # 25-1), Ex. G (Tandoi Depo. at 59).
GSF has not provided any email in which anyone from Exel admits that GSF performed out-
of-scope services.  The emails GSF has provided repeatedly demonstrate that Exel's
representatives, in the process of negotiating a true-up payment, merely acknowledged excess
costs for in-scope services.  Even if one of them used the term "out-of-scope," there is no
evidence that any of them acknowledged that GSF performed services that were out-of-scope
within the meaning of the ISA.

ORDER – 9

**C.      Neither Quantum Meruit Nor Unjust Enrichment Principles Provide GSF a Route to Relief.**

GSF invokes unjust enrichment and quantum meruit as alternative routes to recovery of its excess in-scope service costs.  Those theories are unavailing because the parties negotiated a written agreement governing how GSF would be compensated for its services.  When the parties already have a contract, a party seeking quantum meruit recovery must prove that it incurred expenses resulting from changes that were beyond the parties' contemplation when they entered the contract.  *Hensel Phelps Constr. Co. v. King County*, 787 P.2d 58, 61 (Wash. Ct. App. 1990).  Although this presents a mixed question of fact and law, the initial question is one for the court:

> The first step in the analysis is for the trial court to decide whether the contract contains any ambiguity from which a trier of fact could reasonably find that the damages or changed conditions were not contingencies contemplated by the parties. If, by looking at the four corners of the document, the court can determine that the contract unambiguously contemplates the changes or disruptions experienced by the complaining party, no issue of fact exists and the quantum meruit claim must be dismissed.

*Id.* at 62.  In this case, the record amply demonstrates that both parties were aware of the risk that the per-drop pricing that they had negotiated might not accurately reflect GSF's expenses.  That concern, among others, led the parties to enter an interim agreement while they explored GSF's costs.  GSF's recourse if it was undercompensated was to either walk away from the ISA or negotiate new terms.  GSF does not argue that excess costs were a contingency that the parties did not contemplate, it insists instead that its costs were more than it anticipated.  This is likely true, but GSF undisputedly knew that excess costs were a risk, and nonetheless agreed to a contract in which it accepted that risk on an interim basis.  The court rules that the ISA unambiguously provides for fixed-price services, allocating the risk of excess costs to GSF.  GSF cannot recover in quantum meruit.

ORDER – 10

GSF fares no better by claiming unjust enrichment.  Among other things, a successful unjust enrichment claim requires "the party receiving the benefit [to] accept or retain the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value."  *Cox v. O'Brien*, 206 P.3d 682, 688 (Wash. Ct. App. 2009).  Here, the parties allocated the risk of excess cost for in-scope services to GSF.  It is not inequitable that Exel paid GSF the per-drop prices to which the parties agreed.

**D.     Exel Breached the Anti-Offset Clause, But There Is No Evidence That GSF Incurred Damages.**

Exel's unilateral decision to offset about $360,000 from its final GSF invoices violated the Anti-Offset Clause.  Uncontradicted evidence shows that Exel did not comply with the clause.  Sherman Decl. (Dkt. # 19-1), Ex. B (McNutt Depo. at 78-81, 84-86); *id.*, Ex. C (Schlieman Depo. at 95); *id.*, Ex. E.

Exel does not argue that it complied with the clause, it claims instead that the Anti-Offset Clause did not bind it.  First, it contends that the Anti-Offset Clause did not apply to the warehouse transition costs because those were beyond the scope of the ISA.  Second, it contends that because the ISA had expired by the time it took the offset, the clause was no longer binding.  Exel is wrong on both counts.

The Anti-Offset Clause prohibits Exel from offsetting "*any* claim or expense or deduct *any* such claim or expense from any invoiced amounts payable to [GSF]."  ISA ¶ 4 (emphasis added).  The ISA prohibits Exel from offsetting *any* claim, regardless of whether that claim arose from ISA-related activity or some other business between the parties.

When the ISA expired, Exel was obligated to pay GSF for services it had performed while the ISA was in effect.  Even Exel does not argue otherwise.  There is no question, then, that GSF was entitled to invoice Exel for its services even after the ISA expired.  Exel nonetheless contends that while its obligation to pay survived, its

ORDER – 11

1   obligation not to take offsets from those payments expired.  Exel provides neither legal
2   nor factual support for this argument.  The court rejects it.

3        Exel next argues that GSF suffered no damage from any breach of the Anti-Offset
4   Clause.  As the court previously explained, Mr. Tandoi admitted that the offset that Exel
5   took accurately reflected the value of improvements that Exel installed at the warehouse
6   as well as its prepaid expenses.  Had both parties observed the formalities of the ISA,
7   Exel would have paid GSF's final invoices without taking the $360,000 offset, then sent
8   its own invoice to Exel for the same amount, which Exel would have been obligated to
9   pay.  Putting aside the timing of the payments,[5] the parties would have been in precisely
10  the position that they are now.  GSF makes no attempt to explain how it has been
11  damaged by Exel's breach.

12       The parties devote much attention to whether GSF's lack of damages means that it
13  has no breach of contract claim, or merely that it has a valid breach of contract claim for
14  which it is entitled to no damages.  Courts in Washington have answered that question
15  inconsistently.  *Compare Ketchum v. Albertson Bulb Gardens, Inc.*, 252 P. 523, 525
16  (Wash. 1927) ("Since the action was for damages suffered, mere proof that there was a
17  breach of the contract, without more, did not warrant a verdict in favor of the respondent,
18  even for nominal damages."), *with Ford v. Trendwest Resorts, Inc.*, 43 P.3d 1223, 1229
19  (Wash. 2002) (remanding breach-of-contract claim for entry of nominal damages where
20  the plaintiff had proven breach but not damages).  The court need not resolve this legal
21  dispute yet.  In this case, where GSF has established Exel's breach as a matter of law, but
22  has come forward with no evidence of damages, it is entitled at most to a judgment of
23  nominal damages.  If Exel seeks to avoid even a nominal damage award, it may raise this
24  issue again when the case is ripe for judgment.

---

25  [5] The parties cited no case in which a court considered the damage claim of a party who claimed
26  damage from breach of an anti-offset clause while conceding that the amount of the offset was
    proper.  It is conceivable that a delay in payment as a result of a breach in an anti-offset clause
27  could cause damage in the form of lost interest or other economic gain.  GSF makes no such
    argument here.

28  ORDER – 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part both parties' summary judgment motions.  Dkt. ## 19-20.  The sole issue to be resolved at trial is whether Mr. McNutt agreed on Exel's behalf to make an additional true-up payment of $320,000.

DATED this 18th day of November, 2010.

The Honorable Richard A. Jones
United States District Judge

ORDER – 13